IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Medtronic, Inc., Sprint Fidelis Leads, Products Liability Litigation<br><br>This pleading applies to:<br>THIRD PARTY PAYORS | Court File No. 08-md-1905 (RHK/JSM) |

**MASTER CONSOLIDATED COMPLAINT FOR THIRD PARTY PAYORS**

**JURY DEMAND**

## I. INTRODUCTION

1. Plaintiffs bring this Master Consolidated Complaint for Third Party Payors Plaintiffs, pursuant to PTO No. 4, and assert various claims against Medtronic and its affiliates related to the marketing and sale of Sprint Fidelis Leads. Because the United States Food and Drug Administration (the "FDA") issued a Class I recall related to these leads, they can no longer be legally marketed in the United States and therefore any FDA approval related preemption no longer applies to Plaintiffs' claims. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiffs' allegations have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

2. Medtronic designs, manufactures, and markets a variety of

medical devices to treat heart conditions including implantable cardiac defibrillators ("ICDs"). ICDs are designed to be implanted primarily under the skin of the chest wall and wires called leads are inserted through a major vein and attached directly to the muscle on the inside of the heart and the ICD. Electrodes that sense the heart's rhythm are built into the lead wires and positioned in the heart, where they monitor the heartbeat and can administer an electric shock to abort a dangerous "over-drive pace," a very rapid rhythm, or pace the heart at a normal rhythm if an irregularity is detected.

3. This Master Complaint seeks recovery for Third Party Payors Plaintiffs whose participants have been implanted with, and suffered injury from, Sprint Fidelis Leads marketed by Medtronic under the following model numbers:

(i) the 6949 LFJ extendable/retractable screw fixation (S) model,

(ii) the 6948 LFH tuned fixation (T) model,

(iii) the 6931 LFT S fixation, and,

(iv) the 6930 LFK T fixation

(collectively "Sprint Fidelis Leads"). The Class I recall regarding the Sprint Fidelis Leads affects approximately 268,000 patients worldwide, including 172,000 Sprint Fidelis Lead implants in the United States.

4. In 2004, Medtronic introduced and marketed the Sprint Fidelis Leads to replace the Sprint Quattro Secure Lead Model 6947 ("Quattro Leads") previously marketed by Medtronic. When introducing the Sprint Fidelis,

Medtronic represented that the Sprint Fidelis Leads were smaller and more effective for patients with ICDs, that "[t]he small size of the Sprint Fidelis (Fidelis is a Latin word that means 'faithful') helps improve passage into a patient's venous system for an easier implant, and minimizes venous obstruction" and that the Sprint Fidelis Leads were based on the "proven" design of the Transvene and Quattro Leads, although it knew that it made significant changes in the design and manufacturing processes and failed to adequately advise the FDA of these significant changes. Contrary to Medtronic's representations, the Sprint Fidelis Leads are prone to an unprecedented failure rate for high voltage leads used with ICDs.

5. At all relevant times, Medtronic knew or should have known that the devices were not safe for the patients who received them because of the unacceptable failure rate. Notwithstanding, Medtronic continued to sell the leads for implantation in patients until October 15, 2007, when the Sprint Fidelis Leads were removed from the market pursuant to a recall. Patients in whom the Sprint Fidelis Leads remain implanted, not only have suffered physical injuries, they also bear an unacceptable increase in the risk of fracture, resulting in further injury and possible death.

## II. PARTIES

### A. Plaintiffs

6. Pursuant to PTO No. 4, this Master Consolidated Complaint for Third Party Payors is brought on behalf of all Third Party Payors Plaintiffs

whose participants had Sprint Fidelis Leads implanted.

**B. Defendants**

7. Defendant Medtronic, Inc. is a Minnesota corporation, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432. Medtronic designs, manufactures and markets medical devices worldwide. Medtronic's Cardiac Rhythm Disease Management Division ("CRM Division") which is primarily responsible for Medtronic'sICDs, and leads, including the Sprint Fidelis Leads are principally conducted out of its facilities at Cardiac Rhythm Disease Management at 7000 Central Ave., Minneapolis, Minnesota 55432.

8. Defendant Medtronic International Technology, Inc. (formerly known as Medtronic Puerto Rico, Inc.) is a Minnesota corporation, with its principal place of business at Road 149, km 56.3, Box 6001 Villalba, PR.

9. Defendant Medtronic Puerto Rico Operations Co. is a corporation existing by virtue of the laws of the Cayman Islands, with its principal place of business at Road 149, km 56.3, Box 6001 Villalba, PR.

10. Medtronic International Technology, Inc. and Medtronic Puerto Rico Operations Co. are wholly owned subsidiaries of Medtronic, Inc., which formulate, develop, manufacture and sterilize the devices at issue in this lawsuit.

11. At all relevant times, each of the Defendants and their directors and officers acted within the scope of their authority and on behalf of each

other Defendant. During the relevant times, Defendants possessed a unity of interest between themselves and Medtronic exercised control over its subsidiaries and affiliates. As such, each Defendant is individually, as well as jointly and severally, liable to Plaintiffs for Plaintiffs' damages.

## III. JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

13. Venue is proper under 28 U.S.C. §§ 1391 (a) and (c). Medtronic, Inc. has its headquarters in this District and all Defendants earn substantial compensation and profits from sales of Sprint Fidelis Leads in this District.

## IV. FACTUAL ALLEGATIONS

### A. History Of The Heart Devices

14. In 1980, termination of human arrhythmias with ICDs was reported in the New England Journal of Medicine. Thereafter, a number of devices were designed and approved to detect and treat abnormally fast and irregular heart rhythms and to provide pacing for improper heart rhythms. ICDs include pacemakers as well as defibrillators. Pacemakers are used primarily to correct slow heart rates. Defibrillators detect and correct both fast and slow heart rates. Using the pacemaker and defibrillator function, an ICD can correct slow heart rates, pace rapid heart rates, and administer a shock to stop the heart and allow for a return to an appropriate rhythm.

15. ICDs consist of a generator, a processor, and a lead. The lead

acts to conduct the electrical impulses between the heart and the ICD. Low voltage pacing therapy to treat slow heart rhythms is provided through pace-sense electrodes. High voltage shocks for defibrillation are provided through high voltage conductors. Typically, high voltage leads are inserted through a major vessel and attached directly to the muscle on the inside of the heart. Electrodes that sense the heart's rhythm are built into the lead wires and positioned in the heart, where they monitor the heartbeat and can transmit an electric shock from the ICD to abort dangerous heart rhythms or pace the heart at a normal rhythm.

16. Any failure that compromises the ability of the lead to conduct electrical signals will result in a failure of the ICD to perform properly. Lead failures may include fractured wires, bending, insulation loss, loss of ability to capture changes in electrical characteristics in the ventricle chamber, abnormal lead impedance, sensing failure, and changes in tissue conductor interface.

17. ICD lead diameters are measured using the French Catheter Scale. Medtronic's ICD leads became progressively smaller over time. The lead body for Medtronic's leads before the Sprint Fidelis Leads measured between 7.5Fr (2.5 mm) for the Transvene 6937A model and 8.6Fr (2.8 mm) for the Sprint Quattro 6947 model. Released for sale in 2004, the Sprint Fidelis Leads were considerably smaller than Medtronics' prior leads, measuring only 6.6Fr (2.1 mm) in diameter.

**B. History of The Sprint Fidelis Leads**

18. On or about April 1, 1992, Medtronic, Inc. submitted an Application for Pre-Market Approval ("PMA") to the FDA for approval to manufacture and market a lead system, known as the Medtronic Transvene Lead System. In December 1993, the FDA approved PMA (P920015) pursuant to expedited review.

19. Following approval of the original Transvene lead, Medtronic submitted dozens of supplements to the PMA (P920015), seeking FDA approval of various changes. In 1996, FDA approved lead model 6937, transvene superior vena cava lead (S005).

20. Among the PMA supplements submitted by Medtronic were approvals for lead models 6942 (S012), 6943 and 6945 (S013). In 2001, Medtronic began marketing its then-smallest defibrillation leads known as Sprint Quattro 6947, which were approved for sale pursuant to a supplement to PMA (P920015) in October 2001. In December 2001, the FDA approved a PMA supplement (S017) to market the Sprint Quattro lead 6944.

21. The Sprint Fidelis Leads were not approved under a separate PMA from the FDA. On or about November 6, 2003, Medtronic submitted a PMA supplement for the Sprint Fidelis Leads 6949 and 6931 (S029). On or about December 22, 2003, Medtronic submitted a PMA supplement for the Sprint Fidelis Leads 6948 and 6930 (S030). Both of these supplements were approved by the FDA on June 8, 2004. In its applications, Medtronic

represented that the Sprint Fidelis Leads were based on Transvene and Quattro lead technology, and that the leads were intended for "long-term use" in the human body. The FDA described the changes as relating to a "polyurethane overlay."

22. Even though the Sprint Fidelis Leads represented a distinct departure from earlier lead models, the application was based upon inadequate testing, including reliance entirely on "bench" testing, without any consideration of how the lead would actually function in the human body.

23. Based on Medtronic's representation that the Sprint Fidelis Leads were based on the Transvene and Quattro lead technology, were substantially similar to the previously approved Transvene and Quattro leads, and were safe and effective, the FDA approved the Sprint Fidelis Lead PMA Supplements subject to certain express conditions.

24. Although Medtronic was aware that the Sprint Fidelis Leads were a significant departure from the Transvene and Quattro lead technology and that the Sprint Fidelis Leads manifested various issues that would affect their effectiveness and longevity, Medtronic, in violation of FDA regulations, withheld this information from the FDA, during the PMA supplement process. Accordingly, the issues that arose with the Sprint Fidelis Leads became known to the medical community only after the FDA's approval of the Sprint Fidelis PMA Supplements. Such issues were only known to Medtronic and not the FDA at the time of such approval, and the FDA could not and did not approve

the safety and efficacy of the Sprint Fidelis Leads with knowledge of such information.

25. Medtronic hampered the FDA's review by failing to timely, and meaningfully, report serious injuries and/or deaths that the Sprint Fidelis Leads had, or may have, caused or contributed to causing.

26. Medtronic must comply with the Food, Drug & Cosmetic Act and the Medical Devices Amendment thereto (the "Act") and applicable regulations including post-approval requirements. Among other things, Medtronic is required to continually evaluate the safety, effectiveness and reliability of Sprint Fidelis Leads and to detect, correct, report, and warn of defects in a timely manner. Medtronic failed to do so, in violation of the Medical Devices Act and regulations promulgated thereunder.

### C. <u>Design & Manufacture Of The Sprint Fidelis Leads</u>

27. Medtronic's original coaxial leads passed through a 12Fr. introducer. Later generation smaller multilumen leads passed through a 10.5Fr introducer. The Sprint Quattro 6947 has an 8.2Fr. diameter that passes through a 9Fr introducer. The Sprint Fidelis Leads are 6.6Fr and pass through a 7Fr. introducer.

28. The outer core of the lead is polyurethane (80A) overlay, with an inner core, a centrally located pace-sense conduction coil, and three single and non-redundant conductor cables. One cable is a high voltage RV lead, another is the pace-sense anode cable, and the third is the high voltage SVC coil.

29. Each of the cables is wrapped in a silicone rubber inner cover and the Sprint Fidelis Lead is encased in a polyurethane outer cover.

30. The Sprint Fidelis Lead cables are single MP35N alloy cables that are connected to Platinum-Iridium (pt/Ir) anode ring electrodes or other components by direct resistance spot welding.

31. The design of the Sprint Fidelis eliminated a crimped coupler present in the previous generation of Sprint Quattro that supported the connection of the cables to the electrodes. Instead, the Sprint Fidelis Leads relied solely upon the direct resistance spot welding of two different metals to affix the lead cables.

32. The welding required to affix the Sprint Fidelis Lead cables can damage the fine, small wires in the cables. The welding techniques used were inadequate and resulted in damage to the cables in many Sprint Fidelis Leads.

33. The damage to the small wires of the Sprint Fidelis Lead cables has caused cable wire fractures near to, or at, the weld site in Sprint Fidelis Leads, particularly in areas where there is significant bending and/or flexing of the leads.

34. Medtronic knew that direct-resistance spot welding of dissimilar metals was fraught with issues of weakness and fragility, and that manufacturing of the Sprint Fidelis Leads would require, at a minimum, an enhanced level of accuracy and quality assurance to ensure adequate welding of the cables. Instead, Medtronic failed to take adequate steps to ensure the

quality of the welding in the Sprint Fidelis Leads.

35. Medtronic hid the likelihood of damage to the Sprint Fidelis Leads due to inadequate welding from the FDA, patients, physicians and Plaintiffs.

36. Medtronic failed to recognize the deficiencies of the Sprint Fidelis Leads due to poor and inadequate quality assurance procedures, including failure of Medtronic to implement appropriate physical, manual, x-ray, microscopic and other inspections of the Sprint Fidelis Leads.

37. During the time Medtronic manufactured the Sprint Fidelis Leads at its Puerto Rican facilities, inadequate manufacturing processes were implemented that virtually ensured that all cables were damaged.

38. During the course of manufacturing the Sprint Fidelis Leads, Medtronic failed in several ways, including by:

(a) failing to conduct adequate electrical and mechanical testing on components, subassemblies and/or finished Sprint Fidelis Leads;

(b) failing to test an adequate number of sample devices on an ongoing basis;

(c) failing to take adequate steps to specifically identify failure modes with clarity and suggest methods to monitor, avoid, and/or prevent further failures of the lead wires;

(d) failing to identify and/or note the significance of any testing that resulted in failure of the Sprint Fidelis Leads;

(e) failing to take corrective actions to eliminate or minimize further failures of the Sprint Fidelis Leads;

(f) failing to adequately explain performance specifications for Sprint Fidelis Lead components, subassemblies, and finished leads;

(g) failing to adequately explain or justify all test conditions and acceptance criteria for the Sprint Fidelis Leads;

(h) failing to perform adequate testing in an environment that adequately simulated in vivo conditions;

(i) failing to perform adequate quality assurance testing before and after sterilization as follows:

(1) to verify the electrical continuity of each conduction path to comply with specifications;

(2) to determine the strength of each bond, joint, weld, in the lead as well as the composite lead strength;.

(3) to determine corrosion resistance of all conductors and electrodes, joints, welds or bonds; and

(4) to determine fatigue resistance of the conductors, lead transition zones, and other portions of the lead, including fatigue resistance with respect to

physiological conditions such as ranges of motion and stresses.

39. Medtronic failed to perform adequate testing of the Sprint Fidelis Leads, including the lead connectors and connections, to ensure that the leads would withstand the mechanical forces that might occur during and after implantation.

**D. <u>Sprint Fidelis Lead Defects Are Exposed By Physicians</u>**

40. Upon approval of the Sprint Fidelis Leads, relying upon Medtronic's representations about the "state-of-the-art" nature and ease-of-use of the Sprint Fidelis Leads, physicians began broadly using the Sprint Fidelis Leads instead of other lead models (including the Quattro). Reports of Sprint Fidelis malfunctions soon followed. It is now apparent that a significant percentage of the Sprint Fidelis Leads have potentially fatal defects.

41. In order to track performance of the Sprint Fidelis Leads, Medtronic engaged in a post-marketing study that purported to find that 1.1% of Sprint Fidelis Leads failed within two years of implantation. That study was flawed for many reasons. Members of Medtronic's advisory committee of outside doctors recognized that the study was not sufficient to provide a conclusion about the performance of the Sprint Fidelis Leads. Medtronic nevertheless relied upon this flawed study to avoid disclosing Sprint Fidelis defects to patients and physicians.

42. The electrophysiological community began to suspect there was

an endemic problem with the Sprint Fidelis Leads in around late 2006 into early 2007.

43. In January 2007, Dr. Robert G. Hauser of the Minneapolis Heart Institute ("MHI"), identified several patients who had received inappropriate shocks from Sprint Fidelis Leads. Despite the failure of Medtronic to disclose issues with the Sprint Fidelis Leads, Dr. Hauser and other physicians at MHI began noticing that their patients were complaining that they were being jolted with many unnecessary and painful shocks. When they received complaints from two such patients within two days, doctors at MHI began to research similar incidents across their patient population. That research identified that the Sprint Fidelis Leads were a common link between the patients at MHI who had experienced inappropriate shocks. Thereafter, the doctors concluded that several of MHI's patients had suffered inappropriate shocks because of broken wires in their Sprint Fidelis Leads. Within days, the doctors notified Medtronic of their concern that the Sprint Fidelis Leads were unsafe and advised Medtronic that they therefore would stop implanting Sprint Fidelis Leads.

44. Simultaneously, Medtronic launched a $100 million advertising campaign for its ICD products, with full knowledge and intention that the vast majority of Medtronic ICDs would be implanted with Sprint Fidelis Leads.

45. In February 2007, Dr. Hauser and several other physicians from MHI met with Medtronic Vice President Warren Watson and a Medtronic engineer, to explain that the Sprint Fidelis Leads were exhibiting serious

problems.

46. Medtronic responded by defending the Sprint Fidelis Leads and blaming the doctors' implantation techniques. Medtronic claimed that the doctors' data was insufficient and also incorrectly asserted that the failure rate of Sprint Fidelis Leads was 0.15%, when the failure rate was, in fact, much higher. Moreover, even at 0.15%, the purported Sprint Fidelis Lead failure rate was three times higher than the failure rate that Medtronic acknowledged in the Quattro model.

47. Dr. Hauser advised Medtronic that he was preparing to submit a report to the Heart Rhythm Society for publication on an expedited basis to address this serious potential public health concern. Medtronic sought to persuade Dr. Hauser to withhold publishing his data by, among other things, offering money and/or funding for research surrounding the data in order to delay Dr. Hauser's publication of the information, and took additional steps to prevent Dr. Hauser from going public with his data.

48. After receiving word of the MHI data regarding lead failures, Medtronic immediately retained physicians to refute the data generated by Dr. Hauser and MHI that was about to be published, and throughout February 2007, Medtronic took steps to undermine the credibility of Dr. Hauser's data and findings.

49. Dr. Hauser and the MHI doctors proceeded to conduct and publish a more broad study of the incidence of failures in the Sprint Fidelis

Leads compared to the Sprint Quattro leads. According to the report, prepared by Dr. Hauser, et al., which was provided to Medtronic and was published in the Heart Rhythm Society Journal in the Spring of 2007, "Early Failure of Small-Diameter High-Voltage Inflammable Cardioverter-Defibrillator Lead", Heart Rhythm Society 2007.03.041 (2007) ("Early Failure"), the Sprint Fidelis Lead was much more likely to fail than the Quattro lead.

50. MHI's experience reflected that, between September 2004 and February 2007, 583 patients were implanted with Sprint Fidelis Model 6949 leads, and nine patients received other Sprint Fidelis models. During that time, six patients experienced Sprint Fidelis Model 6949 lead failures. The failed Sprint Fidelis Model 6949 leads had been implanted by various electrophysiologists, cardiologists and thoracic surgeons. The average time to failure was fourteen months (based on a range of four to twenty-three months).

51. The study compared the survival of the 583 Sprint Fidelis Model 6949 leads implanted at the MHI to the survival of 285 Sprint Quattro Model 6947 leads implanted at the MHI between November 2001 and March 2007. The difference in survival between the Sprint Fidelis Model 6949 lead and the Sprint Quattro Secure Model 6947 lead was extremely significant. The failure rate for the Sprint Fidelis Model 6949 lead was 1-2% during the first two years of implant and was ten times greater than the failure rate for the Sprint Quattro Secure Model 6947 lead.

52. Another study, conducted at Cornell University Medical Center

by Sunil Mirchandani, et al., at around the same time found "(a) 17% incidence of abnormal right ventricular sensing during follow-up of patients implanted with the Medtronic Sprint Fidelis ICD lead," necessitating "an early revision of the system in 4% of patients."

53. Medtronic maintained that the Sprint Fidelis Lead fractures were not "statistically significant." It issued a notice to physicians on March 21, 2007 in the form of a "Dear Doctor" letter that disclosed that "Medtronic has received reports from a limited number of implanting physicians indicating that they have experienced higher than expected conductor fracture rates in . . . Sprint Fidelis Leads." Medtronic claimed to be investigating reports of lead failures, however, still falsely represented that the Sprint Fidelis Leads were performing consistent with, and "in line with other Medtronic leads .... And consistent with lead performance publicly reported by other manufacturers."

54. This letter suggested that the Sprint Fidelis Lead fractures were the result of poor implantation techniques and stated that, "[f]or conductor fractures that occur around the suture sleeve, our preliminary investigation suggests that under certain implant techniques, the lead appears to be exposed to severe bending or kinking in the pectoral area." Medtronic also wrote that the fractures and failures were the result of implanter physicians being "too rough with the implant or too tight with the sutures."

55. At no time did Medtronic warn physicians that the Sprint Fidelis Leads must be specially handled during the implantation procedure or that they

could "severely bend" or "kink" if they are implanted using certain accepted implant techniques.

56. Around this time, although Medtronic still maintained that there were no issues with Sprint Fidelis Leads, other doctors began to stop implanting them. Even still, Medtronic continued to market the leads to unsuspecting physicians and patients, selling tens of thousands of units between February and October 2007.

57. In April 2007, Dr. Hauser published his data in the Journal of the Heart Rhythm Society, HEART RHYTHM, indicating that the Sprint Fidelis Leads had a higher than expected failure rate. Medtronic, through two members of its Medical Advisory Board, published criticisms of Dr. Hauser's data.

58. Despite its efforts to refute Dr. Hauser's findings, Medtronic in fact knew that changes were required to the Sprint Fidelis Leads. Accordingly, Medtronic submitted an application to the FDA for design and manufacturing changes to "improve the df-1 leg strength and handling characteristics of Sprint Fidelis Leads" on May 15, 2007. Just as Medtronic did with the recall of its Marquis family of ICDs with defective batteries, Medtronic made claims to the FDA of the leads' increased robustness, but withheld all information that its leads were failing and causing public health crisis. Medtronic's PMA Supplement was approved in July 2007, and while Medtronic may be presumed to have implanted the changes at that time, already-manufactured Sprint

Fidelis Leads were not recalled and continued to be shipped, remained in hospital inventories, and continued to be implanted.

59. On July 19, 2007, Dr. Hauser met with Medtronic officials again to urge Medtronic to stop selling the Sprint Fidelis Leads. Medtronic's Vice President for quality and regulatory affairs, Reggie Groves, declined to adopt Dr. Hauser's recommendations and, instead, referred to a Medtronic PowerPoint presentation that purported to explain that the incidence of fractures in the Sprint Fidelis Leads was "not statistically significant" (although such lead failure can lead to serious injury or death).

60. Throughout 2007, while Sprint Fidelis Leads were being implanted in patients across the United States and around the world, Medtronic was accumulating mounting and overwhelming reports that the Sprint Fidelis Leads were failing at an alarming and undisclosed rate.

61. Medtronic knew that it faced serious issues with defective Sprint Fidelis Leads. It had determined that at least five deaths since August 2006 were potentially linked to Sprint Fidelis failures and also that the Sprint Fidelis overall failure rate was at least 2.3% after 30 months on the market. That failure rate was higher than the failure rate of a Quattro model and also higher than anything Medtronic had previously disclosed.

62. On or around September 10, 2007, belatedly and in violation of Federal regulations, Medtronic filed more than 120 adverse event reports with the FDA regarding Sprint Fidelis Leads.

63. On October 7, 2007, top Medtronic executives met and decided to suspend sales of Sprint Fidelis Leads. Following that October 7, 2007 decision, Sprint Fidelis Leads continued to be implanted in patients across the country including patients who experienced lead failures.

E. **Recall Of The Sprint Fidelis Leads**

64. Just after midnight on October 15, 2007, Medtronic announced a worldwide recall of all Sprint Fidelis Lead models. Physicians were notified to stop using the Sprint Fidelis Leads and return all remaining Sprint Fidelis Leads to Medtronic.

65. Shortly thereafter, the FDA issued a Class I Recall of the Sprint Fidelis Leads. Class I Recalls are the most serious type of medical device recall and involve situations in which there is a reasonable probability that the use of the produce will cause serious injury or death.

66. In its announcement, Medtronic advised patients with Sprint Fidelis Leads to contact their physicians immediately for reprogramming of their ICDs in order to be more sensitive to potential lead fractures, a service for which patients could be charged by their physicians.

67. In addition, physicians recommended that some patients sign up for Medtronic's monitoring system, called CareLink, in order to attempt to monitor whether fractures could appear in the leads. Patients could also be charged for this service. This system is not available to many patients who have Sprint Fidelis Leads connected to non-Medtronic ICDs.

68. Medtronic indicated that it would not compensate patients or physicians for the additional medical care required to monitor the Sprint Fidelis Leads unless a Sprint Fidelis Lead actually fractured, in which case Medtronic would offer a new lead system plus $800 toward unreimbursed medical expenses relating to extraction/capping surgery, which typically costs well above $10,000. Thereafter, Medtronic extended the same offer to any patient who had a Sprint Fidelis Lead extracted due to the recall.

69. As of January 2007, approximately 144,311 Sprint Fidelis Model 6949 leads; 7,510 Model 6948 leads; 5,387 Model 6931 leads; and 236 Model 6930 Sprint Fidelis Leads had been implanted. As of October 2007, it was estimated that 257,000 of these leads remained implanted.

**F. <u>The Sprint Fidelis Lead Defect And Failure Rates</u>**

70. By October 2007, Medtronic was aware of at least 665 chronic fractures in returned Sprint Fidelis Leads and that they exhibited significantly reduced lead survival of no more than 97.7% at 30 months compared to Medtronic's predecessor lead, the Sprint Quattro, which had a 99.1% survival rate.

71. Medtronic was aware that the Sprint Fidelis Lead survival rate was unacceptable as compared to industry failure rates, and that failure rates of Sprint Fidelis Leads implanted in children were high, with a survival rate of no more than 98.4% at 30 months.

**G. Medical Monitoring**

72. Medtronic's safety advisory recommended (and continues to recommend) pace-sense (P/S) conductor impedance monitoring and ventricular fibrillation (VF) detection adjustments to reduce the likelihood that a patient would receive inappropriate therapies when a fracture occurred or occurs.

73. Medtronic contends that impedance monitoring may also detect a fracture of the high-voltage conductor and has recommended programming alerts to pre-empt Sprint Fidelis Lead malfunction due to fracture.

74. Presently, it is recognized that impedance monitoring for detecting impending Sprint Fidelis Lead failure and for preventing adverse clinical events such as inappropriate shocks is failing.

75. Studies that have focused on the monitoring recommendations made by Medtronic have found them to be inadequate. A recent study by doctors, including Dr. Hauser, has concluded that CareLink and the Medtronic-recommended reprogramming are not adequate to protect most patients from the adverse effects of the defective Sprint Fidelis Leads, which can include massive and painful shocks which, in and of themselves, can alter an otherwise normal heart rhythm to trigger further damage or death. *See* "Failure of impedance monitoring to prevent adverse clinical events caused by fracture of a recalled high-voltage implantable cardioverter-defibrillator lead," Linda M. Kallinen, BS; Robert G. Hauser, MD; FHRS, Ken W. Lee, MD; Adrian K. Almquist, MD; William T. Katsiyiannis, MD; Chuen Y. Tang, MD; Daniel P.

Melby, MD; & Charles C. Gornick, MD (published in Heart Rhythm, June 8, 2008).

76. Patients with these leads have suffered repeated shocks and fractures, after the enhanced monitoring system was in place, and the monitoring failed. These patients suffered these shocks and fractures without any alarm sounding from this purportedly "enhanced" monitor.

77. Pace-sense conductor impedance monitoring as currently implemented does not reliably forewarn patients of a lead malfunction. Consequently, patients who have Sprint Fidelis Leads remain at risk for additional physical injury and adverse clinical events associated with pace-sense conductor fracture.

78. Upon information and belief, an article is being published in a peer reviewed journal describing this phenomenon of inappropriate therapy and inadequacy of the Medtronic monitoring recommendations and recommending that more aggressive monitoring be considered and recommended.

79. It is believed by the medical community and the pacing community, in particular, that additional programming measures are needed to detect lead fractures before inappropriate therapy is administered and therefore Medtronic is responsible to Plaintiffs for all costs associated with medical monitoring to detect lead failure and fracture.

**H. <u>The Regulatory Approval Process</u>**

80. A pre-market approval application ("PMA") must be submitted

to the FDA for any Class III medical device. *See* 21 U.S.C. 515(b); 21 C.F.R. §814.3(e).

81. A PMA must contain certain information which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue. A PMA and/or PMA Supplement application must provide: a) proposed indications for use; b) device description including the manufacturing process; c) any marketing history; d) summary of studies (including non-clinical laboratory studies, clinical investigations involving human subjects, and conclusions from the study that address benefit and risk considerations); e) methods used in manufacturing the device, including compliance with current good manufacturing practices; and f) information relevant to an evaluation of the safety and effectiveness of the device known to or that should reasonably be known to the manufacturer from any source, including commercial marketing experience. Medtronic failed to comply with the Act and the regulations in its filing for and responses to inquiries made by the FDA as part of the PMA Supplement process.

82. A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval for that device. Failing to comply with the conditions submitted and approved in the PMA or PMA supplement may cause the device to be considered adulterated and/or misbranded.

## I. Federal Regulations Prescribing Requirements Which Medtronic Violated – Background

83. Federal regulations state: "Recall classification means the numerical designation, i.e., I, II or III, assigned by the Food and Drug Administration to a particular product recall to indicate the relative degree of health hazard presented by the product being recalled." 21 CFR §7.3 (m).

84. Pursuant to federal law, a device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. See, 21. U.S.C. §351.

85. Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. See, 21 U.S.C. §352.

86. Pursuant to federal law, Medtronic is required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, Medtronic was required to record and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or

contribute to death or serious injury.

87. Pursuant to FDA regulations, Medtronic was required to report to the FDA adverse events associated with a medical device within 30 days after it became aware that a device may have caused or contributed to death or serious injury, or that a device has malfunctioned and would be likely to cause or contribute to death or serious injury if the malfunction was to recur. Such reports must contain all information reasonably known to Medtronic, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the Medtronic's possession. In addition, Medtronic is responsible for conducting an investigation of each adverse event, and must evaluate the cause of the adverse event. 21 CFR §803.50.

88. Pursuant to FDA regulations, Medtronic as a manufacturer of medical devices must also describe in every individual adverse event report whether remedial action was taken in regard to the adverse event, and whether the remedial action was reported to the FDA as a removal or correction of the device. 21 CFR §803.52.

89. Pursuant to federal regulations, Medtronic must report to the FDA in 5 business days after becoming aware of any reportable MDR event or events, including a trend analysis that necessitates remedial action to prevent an unreasonable risk of substantial harm to public health. 21 CFR §803.53.

90. Pursuant to federal regulations, Medtronic must report promptly to the FDA any device corrections and removals, and maintain records of

device corrections and removals. FDA regulations require submission of a written report within ten working days of any correction or removal of a device initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation of the Act caused by the device which may present a risk to health. The written submission must contain, among other things, a description of the event giving rise to the information reported and the corrective or removal actions taken, and any illness or injuries that have occurred with use of the device, including reference to any device report numbers. Medtronic was required to indicate the total number of devices manufactured or distributed which are subject to the correction or removal, and provide a copy of all communications regarding the correction or removal. 21 CFR §806.

91. Pursuant to federal regulations, Medtronic was required to comply with specific quality system requirements promulgated by the FDA. These regulations require Medtronic to meet design control requirements, including but not limited to conducting design validation to ensure that devices conform to defined user needs and intended uses. Further, Medtronic was required to meet quality standards in manufacture and production; to establish and maintain procedures for implementing corrective actions and preventive actions, and investigate the cause of nonconforming product and take corrective action to prevent recurrence; to review and evaluate all complaints and determine whether an investigation is necessary; and was required to use

statistical techniques where necessary to evaluate product performance. 21 CFR §820.

92. Pursuant to federal regulations, Medtronic was required to report to the FDA, through a PMA Supplement, any new indications for use of a device, labeling changes, or changes in the performance or design specifications, circuits, components, ingredients, principle of operation or physical layout of the device.

### J. Medtronic's Violations Of Medical Device Reporting Regulations and Knowledge Of Defects

93. The federal regulations also include specific device reporting requirements for manufacturers, importers, and distributors. For example, serious injuries and/or deaths that a device has or may have caused, or contributed to, must be reported on a timely basis. Medtronic failed to meet those requirements.

94. Medtronic was acutely aware of the potentially life-threatening defects manifested in the Sprint Fidelis Leads for months, if not years, before the October 2007 recall. Medtronic, however chose not to timely issue a "firm-initiated recall," change its label to increase the warnings, and/or warn the FDA, doctors or patients of the defect.

95. Medtronic was required to timely self-report adverse events through the FDA's medical device reporting ("MDR") system. These MDR regulations are designed to assist the FDA in protecting "the public health by

helping to ensure that devices are…safe and effective for their intended use." Medtronic was required to make an FDA report "no later than 30 calendar days" after it "become[s] aware of information, from any source, that reasonably suggests that a device [it] market[s] …has malfunctioned and this device or a similar device that [it] market[s] would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur…."

96. Further, Medtronic was required to conduct an investigation of each event involving Sprint Fidelis Leads and evaluate the cause of the event. In certain instances, such as when a reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health, Medtronic was required to file a report with FDA within five days. Medtronic failed to comply with this regulation.

97. On July 3, 2007, the FDA directed a "Warning Letter" to Medtronic's Chairman and CEO relating to Medtronic's Neuromodulation and identifying violations of Federal Regulations which included: "[f]ailure to implement complaint handling procedures to ensure that all complaints are evaluated to determine whether the complaint represents an event that must be filed as a Medical Device report under 21 C.F.R. Part 803, as required by 21 C.F.R. 820.198(a)(3) and "[f]ailure to submit MDR reports within 30 days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed device may have caused or contributed to a death or serious injury, as required by 21 C.F.R. 803.50(a)(1)." The Warning Letter confirmed

that Medtronic's procedures resulted in violations of the MDR regulations because Medtronic improperly interpreted the MDR regulations. The Warning Letter further provided, in part that the regulatory violations found by the FDA "may be symptomatic of serious underlying problems in [Medtronic's] manufacturing and quality assurance systems."

98. Similarly, the Warning Letter's observation of underlying problems in Medtronic's manufacturing and quality systems was correct as to the systems Medtronic implemented with respect to the Sprint Fidelis Leads, including that Medtronic also violated the MDR regulations relative to the Sprint Fidelis Leads.

99. As with its neuromuscular products Medtronic analyzed some of the leads that were returned to company and did not comply with regulations regarding analysis and reporting.

100. Medtronic's representations to physicians and the public regarding the consistent performance of Sprint Fidelis Leads were untrue in light of the reported experience with the leads, the various problems highlighted in the FDA's MAUDE database of complaints/issues reported to the FDA, and the information independently brought to Medtronic by concerned doctors regarding the dangerous propensities of the Sprint Fidelis Leads, all of which were known and/or knowable by Medtronic.

101. At all relevant times, Medtronic misrepresented the safety of the Sprint Fidelis Leads and negligently manufactured, marketed, advertised,

promoted, sold, and distributed the leads as safe devices to be used together with ICDs.

102. At all relevant times, Medtronic failed to timely and adequately warn the FDA, doctors and patients of the defects inherent in the Sprint Fidelis Leads and that they were prone to cause inappropriate shocks and to fracture.

103. At all relevant times, Medtronic failed to manufacture and inspect the Sprint Fidelis Leads in a manner consistent with, and as prescribed by the FDA-approved specifications for manufacture and inspection of the Sprint Fidelis Leads.

104. At all relevant times, Medtronic failed to adhere to, and otherwise comply with FDA regulations in the manufacture, inspection, distribution, shipment, and sale of the Sprint Fidelis Leads.

## K. Medtronic's Improper Failure To Recall Sprint Fidelis Leads

105. Under federal regulations, a recall is: "a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure." A recall is an effective method of removing or correcting consumer products that are in violation of laws administered by the FDA.

106. These sections also recognize that recall is an alternative to an FDA-initiated court action for removing or correcting violative, distributed products by setting forth specific recall procedures for the Food and Drug

Administration to monitor recalls and assess the adequacy of a firm's efforts in recall. A company's voluntary recall of a medical device and the FDA's classification of that action as a Class I recall establish that the device violates FDA regulations.

107. In connection with the Sprint Fidelis recall, the FDA publicly stated that it considers Medtronic's action to be a product recall, as defined by FDA regulations, and on October 15, 2007, classified the recall as a Class I, potentially life threatening, recall. At all relevant times to this action, Medtronic's delayed recall of the Sprint Fidelis Leads constituted a violation of the FDA regulations.

## L. <u>Fraudulent Concealment</u>

108. Medtronic's failure to document or follow up on the known defects in Sprint Fidelis Leads, and concealment of known defects from the FDA, patients, Plaintiffs, and the medical community constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

109. Medtronic is estopped from relying on the statute of limitations defense because Medtronic actively concealed the lead defects by, among other things, suppressing reports, failing to follow through on FDA notification requirements, and failing to disclose known defects to physicians. Instead of revealing the defects, Medtronic continued to represent the Sprint Fidelis Leads as safe for their intended use.

110. Medtronic's conduct, as described in the preceding paragraphs,

amounts to conduct purposely committed, which Medtronic must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of patients.

## V. CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF MINNESOTA FALSE STATEMENT IN ADVERTISING STATUTES

111. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

112. Defendants produced and published advertisements and deceptive and misleading statements of the soundness and mechanical reliability of the Sprint Fidelis Leads after learning of their inherent defects with the intent to sell the Sprint Fidelis Leads.

113. Defendants concealed their deceptive practices in order to increase the sale of and profit from the Sprint Fidelis Leads.

114. Defendants violated the Minnesota False Statements in Advertising Act, Minn. Stat. § 325F.67 et seq., when they failed to comply with FDA requirements and when they failed to adequately warn consumers and the medical community of the safety risks associated with the Sprint Fidelis Leads.

115. Defendants violated Minn. Stat. § 325F.67 by intending to sell and create customer demand for the Sprint Fidelis Leads by using deceptive or untrue statements of fact about the Sprint Fidelis Leads' mechanical soundness

and the reliability of the leads through promotional materials, including but not limited to, Defendants' website and medical brochures distributed to patients and physicians.

116. As a direct result of Defendants' deceptive, unfair, unconscionable, and fraudulent conduct and violation of Minn. Stat. § 325F.67 et seq., Plaintiffs were injured in that they paid substantial sums for the Sprint Fidelis Leads and for the costs of replacing the Sprint Fidelis Leads that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

117. The Minnesota False Statement in Advertising Act applies to Plaintiffs' transactions with Defendants because Defendants deceptive scheme was carried out in Minnesota and affected Plaintiffs whose participants were implanted with the defective Sprint Fidelis Leads.

118. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have incurred health care costs related to the Sprint Fidelis Leads that have been paid by them but are the responsibility of Defendants, in an amount to be determined at trial.

**COUNT II**
**VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICE ACT**

119. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

120. Defendants applied advertising and marketing campaigns

representing the Sprint Fidelis Leads as mechanically sound and medically safe, while Defendants knew of the defects in the Sprint Fidelis Leads. Defendants continued these campaigns of deception until 2007, when the Sprint Fidelis Leads were recalled.

121. Defendants knew or should have known of the defective nature of the Sprint Fidelis Leads but denied public access to the information, to avoid corporate responsibility. Defendants knew patients and their physicians were at a disadvantage in accessing information involving the safety of the Sprint Fidelis Leads.

122. Defendants concealed the defects of the Sprint Fidelis Leads for the purposes of higher profits and increased sales.

123. Defendants have violated Minn. Stat. §325D.44. The violations include the following:

(a) Defendants violated Minn. Stat. §325D.44 (5) by representing the Sprint Fidelis Leads as having characteristics, uses, and benefits of a safe and mechanically sound device while knowing the statements were false and the Sprint Fidelis Leads contained inherent defects, including manufacturing defects;

(b) Defendants violated Minn. Stat. § 325D.44 (7) by representing the Sprint Fidelis Leads as a non-defective medical product of a particular standard, quality, or grade

while knowing the statements were false and the Sprint Fidelis Leads contained inherent defects, including manufacturing defects;

(c) Defendants violated Minn. Stat. § 325D.44 (9) by advertising, marketing, and selling the Sprint Fidelis Leads as medically reliable and without a known design defect while knowing those claims were false and without any medical support; and

(d) Defendants violated Minn. Stat. § 325D.44 (13) by creating a likelihood of confusion about the efficacy and mechanical soundness of the Sprint Fidelis Leads, comparing the Sprint Fidelis Leads with other non-defective products.

124. The Minnesota statutes prohibiting unfair and deceptive trade practices apply because Defendants' deceptive scheme was carried out in Minnesota and affected Plaintiffs whose participants were implanted with the Sprint Fidelis Leads containing the known defects.

125. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have incurred health care costs related to the Sprint Fidelis Leads that have been paid by them but are the responsibility of Defendants, in an amount to be determined at trial.

**COUNT III**
**VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**

126. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

127. Defendant engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the Minnesota Consumer Fraud statute, Minn. Stat. § 325F.67 *et seq*., when it failed to comply with FDA requirements and when it failed to adequately warn consumers and the medical community of the safety risks associated with the Sprint Fidelis Leads. As a direct result of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct and violation of Minn. Stat. § 325F.67 *et seq*., Plaintiffs were injured in that they paid substantial sums for the Sprint Fidelis Leads and for the costs of replacing the Sprint Fidelis Leads that they would not have paid had Defendant not engaged in unfair and deceptive conduct.

128. The Minnesota statutes prohibiting consumer fraud apply to all of Defendants' transactions with Plaintiffs whose participants were implanted with the Sprint Fidelis Leads because Defendants' deceptive scheme was carried out in Minnesota and affected Plaintiffs whose participants were implanted with defective Sprint Fidelis Leads.

129. As a result of Defendants' myriad ties to and activities within the State of Minnesota, as more specifically described herein, Plaintiffs hereby seek injunctive relief in the form of application of the Minnesota Consumer Fraud statute and other Minnesota consumer protections statutes to Plaintiffs' claims.

130. As a direct and proximate result of Defendants' wrongful conduct,

Plaintiffs have incurred health care costs related to the Sprint Fidelis Leads that have been paid by them but are the responsibility of Defendants, in an amount to be determined at trial.

**COUNT IV**
**NEGLIGENCE**

131. Plaintiffs hereby incorporate by reference the preceding paragraphs as if fully set forth herein.

132. Defendants had a duty to Plaintiffs to comply with FDA standards and regulations, use reasonable care in the design, manufacture, and testing of its devices, provide a safe product in design and manufacture, and warn Plaintiffs of the defective nature of the Sprint Fidelis Leads at the earliest possible date. Defendants breached their duty of reasonable care to Plaintiffs by incorporating a defect into the design of said devices, thereby causing economic injuries to Plaintiffs.

133. Defendants breached their duty of reasonable care to Plaintiffs by manufacturing and assembling the Sprint Fidelis Leads in such a manner that they were prone to fail to operate and malfunction and expose Plaintiffs to economic injuries.

134. Defendants breached their duty of reasonable care to Plaintiffs by failing to notify Plaintiffs at the earliest possible date of known design defects in the Sprint Fidelis Leads.

135. Defendants breached their duty of reasonable care to Plaintiffs by failing to comply with the FDA's Pre-Market Approval standards for the devices.

136. Defendants breached their duty of reasonable care to Plaintiffs by failing to exercise due care under the circumstances.

137. As a direct and proximate result of the carelessness and negligence of Defendants, as set forth in the preceding paragraphs, Plaintiffs have sustained and will continue to sustain economic losses and other damages, and are therefore entitled to compensatory damages and equitable and declaratory relief according to proof.

## COUNT V
## NEGLIGENCE PER SE

138. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

139. Defendants had an obligation not to violate the law in the manufacture, design, testing, manufacturing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing or use, warning of the risks and dangers of the Sprint Fidelis Leads, and otherwise distributing the Sprint Fidelis Leads.

140. Defendants' acts constitute an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S. C. Section 331(a) and 333(a)(2), and constitute a breach of duty subjecting Defendants to civil liability for all damages arising there from, under theories of negligence per se.

141. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages including incurring health care costs that have been paid by them but are the responsibility of Defendants, in an amount to be proven at trial.

**COUNT VI**
**UNJUST ENRICHMENT**

142. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

143. To the detriment of Plaintiffs, Defendants have been, and continue to be unjustly enriched as a result of the unlawful and/or wrongful collections of, *inter alia*, payments for the Sprint Fidelis Leads and associated costs.

144. In exchange for the payments made for Sprint Fidelis Leads, and at the time they made these payments, Plaintiffs expected that the Sprint Fidelis Leads were safe and medically effective treatment for the condition, disorder, or symptom for which they were prescribed.

145. The cumulative effect of Defendants' conduct directed at physicians and consumers was to artificially create demand for Sprint Fidelis Leads. Plaintiffs were injured by the cumulative and indivisible nature of Defendants' conduct.

146. Accordingly, Plaintiffs seek full restitution of Defendants' enrichment, profits, revenues, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT VII**
**PRODUCTS LIABILITY**

147. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

148. At all relevant times hereto, Defendants were engaged in the development, testing, manufacturing, marketing and sales of Sprint Fidelis Leads. Defendants designed, manufactured, assembled and sold these devices to medical professionals, knowing that they would then be implanted in patients with heart disease and disorders. Defendants knew the costs of the devices and related medical expenses would then be passed on in whole or in part to Plaintiffs' participants and thereby Plaintiffs.

149. Defendants distributed and sold the Sprint Fidelis Leads in the condition in which they left their place of manufacture, in their original form of manufacture, which included the defects described herein. The Sprint Fidelis Leads were expected to and did reach Plaintiffs' participants without substantial change in their condition as manufactured and sold by Defendants. At no time did Plaintiffs have reason to believe that the devices were in a condition not suitable for their proper and intended use among the patients in whom they were to be implanted.

150. The Sprint Fidelis Leads designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Defendants were in a dangerous and defective condition and posed a threat to any user or

consumer of the leads. Plaintiffs were and are in a class of persons that Defendants should have considered to be subject to the harm caused by the defective nature of the devices.

151. The devices were implanted and used in the manner for which they were intended, that is for the detection, correction, and prevention of serious and/or life-threatening harm through surgical implantation. This use has resulted in injury to Plaintiffs.

152. Plaintiffs were not able to discover, nor could they have discovered through the exercise of reasonable care, the defective nature of the Sprint Fidelis Leads. Further, in no way could Plaintiffs have known that Defendants had designed, developed, and manufactured these Leads in such a way as to increase the risk of harm, injury or death to the recipients of the devices.

153. As a direct and proximate cause of the design, development, manufacture, marketing, and sales of the Sprint Fidelis Leads, Plaintiffs have sustained and will continue to sustain economic losses, and are, therefore, entitled to compensatory relief in an amount to be proven at trial. Further, Plaintiffs are entitled to a declaratory judgment that Defendants is liable for breach of their duty to Plaintiffs and failure to provide a safe and effective medical device. Plaintiffs are also entitled to equitable relief.

## COUNT VIII
## BREACH OF IMPLIED WARRANTY

154. Plaintiffs hereby incorporate by reference all preceding paragraphs

as if fully set forth herein.

155. Prior to the time that Plaintiffs' participants were implanted with the Sprint Fidelis Leads, Defendants impliedly warranted that their Sprint Fidelis Leads, which Defendants designed, manufactured, assembled, promoted and sold, were merchantable and fit and safe for ordinary use.

156. Prior to the time that Plaintiffs' participants were implanted with the Sprint Fidelis Leads, Defendants further impliedly warranted that their Sprint Fidelis Leads, which Defendants designed, manufactured, assembled, promoted and sold, were fit for the particular purposes for which they were sold, including to provide prophylactic treatment of patients with prior myocardial infarction and a limited ejection fraction, patients who have had spontaneous and/or inducible life-threatening ventricular arrhythmias, and patients who are at high risk for developing such arrhythmias.

157. Contrary to these implied warranties, Sprint Fidelis Leads were defective, unmerchantable, and unfit for their ordinary use when sold, and unfit for the particular purpose for which they were sold.

158. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages including incurring health care costs that have been paid by them but are the responsibility of Defendants, in an amount to be proven at trial.

## COUNT IX
## BREACH OF EXPRESS WARRANTY

159. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

160. Defendants expressly warranted to Plaintiffs, by and through Defendants and/or their authorized agents or sales representatives, in publications, package inserts, the internet, and other communications intended for physicians, medical patients, and the general public, that the Sprint Fidelis Leads were safe, effective, fit and proper for their intended use.

161. In allowing the implantation of the Sprint Fidelis Leads, participants of Plaintiffs and their physicians relied on the skill, judgment, representations, and express warranties of Defendants. These warranties and representations were false in that the Sprint Fidelis Leads were not safe and were unfit for the uses for which they were intended.

162. Through sale of the Sprint Fidelis Leads, Defendants are merchants pursuant to Section 2-314 of the Uniform Commercial Code.

163. Defendants breached their warranty of the mechanical soundness of the Sprint Fidelis Leads by continuing sales and marketing campaigns highlighting the safety of its product, while it knew of the defects and risk of product failure.

164. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages including incurring health care costs that have been paid by them but are the responsibility of Defendants, in an amount to be proven at trial.

**COUNT X**
**BREACH OF ASSUMED CONTRACTUAL WARRANTY OBLIGATION**

165. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

166. Defendants acknowledged their obligation as first party insurer by providing express and implied warranties directly to consumers of its products, and specifically the Sprint Fidelis Leads.

167. Defendants have an obligation to repay Plaintiffs for all costs incurred with the Sprint Fidelis Leads because it has acknowledged a responsibility under its warranties to make payment with regard to the recalled leads.

168. As a direct and proximate result of Defendants' breach of its assumed contractual duties, Plaintiffs have incurred health care costs related to the Sprint Fidelis Leads that have been paid by them, but are the responsibility of Defendants, in an amount to be proven at trial.

**COUNT XI**
**MISREPRESENTATION BY OMISSION**

169. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

170. Defendants misrepresented the mechanical soundness and reliability of the Sprint Fidelis Leads through promotional and marketing campaigns. Defendants continued this misrepresentation for an extended period of time, without disclosing material information.

171. Defendants took advantage of the limited opportunity participants of Plaintiffs (and their physicians) had to discovery Defendants' intentional concealment of the defects and risks in the Sprint Fidelis Leads.

172. Defendants concealed these design defects by withholding information pertaining to the inherent design defects and high risks of failure relating to the Sprint Fidelis Leads and presenting these leads as safe and reliable.

173. Defendants' intentional misrepresentations and omissions were made willfully, wantonly or recklessly to the participants of Plaintiffs (through their physicians) to induce purchase of the Sprint Fidelis Leads over its competitors.

174. Defendants knew or should have known of the high risk beneficiaries of Plaintiffs would encounter by unwittingly agreeing to have implanted the Sprint Fidelis Leads.

175. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have incurred health care costs related to the Sprint Fidelis Leads that have been paid by them, but are the responsibility of Defendants, in an amount to be proven at trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter the following relief:

a. Under all counts, the Court enter a preliminary injunction in joining the Defendants from failing to provide to counsel, under appropriate Court-ordered terms under HIPAA, the registrant list(s) for the Sprint Fidelis Leads;

b. Under all counts, an award of appropriate monetary and non-monetary relief including the Court enter judgment available compensatory damages, statutory damages, punitive damages, reasonable attorneys fees and expenses;

c. For medical monitoring, whether denominated as damages or in the form of equitable relief;

d. For Plaintiffs' costs and expenses of this litigation, including all reasonable attorneys' fees and expert fees; and

e. Plaintiffs be granted such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## VII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: July 2, 2008

Respectfully submitted,

On Behalf of the Plaintiff Steering Committee:

s/Daniel E. Gustafson
Daniel E. Gustafson (#202241)
GUSTAFSON GLUEK PLLC
650 Northstar East
608 2nd Avenue South
Minneapolis, MN 55402
***Lead Counsel***

Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
***Liaison Counsel***

Charles S. Zimmerman
Ronald S. Goldser
ZIMMERMAN REED PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
***Chair of Plaintiff Steering Committee***

**PLAINTIFF STEERING COMMITTEE:**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, LA 71309-1190

C. Brooks Cutter
KERSHAW, CUTTER & RATINOFF, LLP
980 Ninth Street, 19th Floor
Sacramento, CA 95814

Jim Doyle
WILLIAMS, KHERKHER, HART & BOUNDAS LLP
8441 Gulf Freeway, Suite 600
Houston, TX 77017

R. Jackson Drake
WHATLEY DRAKE & KALLAS
1000 Park Place Tower
2001 Park Place North
Birmingham, AL 35202

Nicholas J. Drakulich
THE DRAKULICH FIRM
2727 Camino Del Rio South, Suite 322
San Diego, CA 92108

Wendy R. Fleishman
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017

Michael K. Johnson
GOLDENBERG & JOHNSON, PLLC
33 South Sixth Street, Suite 4530
Minneapolis, MN 55402

Dianne M. Nast
RODA NAST P.C.
801 Estelle Drive
Lancaster, PA 17601

Tina B. Nieves
GANCEDO & NIEVES LLP
418 N. Fair Oaks Avenue, Suite 202
Pasadena, CA 91103

Neil D. Overholtz
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
803 North Palafox Street
Pensacola, FL 32501

Eric M. Quetglas-Jordan
QUETGLAS LAW OFFICES
P.O. Box 16606

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON

San Juan, PR 00908

Camilo K. Salas, III
SALAS & CO., L.C.
650 Poydras Street, Suite 1660
New Orleans, LA 70130

Marcus L. Stevenson
THE RIFF STEVENSON LAW FIRM, LLP
2014 Bissonnet
Houston, TX 77005

Teresa Toriseva
WEXLER, TORISEVA WALLACE LLP
1446 National Road
Wheeling, WV 26003

620 Newport Center Drive, 7th Floor
Newport Beach, CA 92660

Hunter J. Shkolnik
RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP
113 East 37th Street
New York, NY 10016

Fred Thompson, III
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Leila H. Watson
COREY, WATSON, CROWDER & DeGARIS, P.C.
2131 Magnolia Avenue
Birmingham, AL 35205